# 24-2568

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

EVIE COLLAZA, on behalf of herself and all others similarly situated,

*Plaintiff-Appellant,*

—against—

JOHNSON & JOHNSON CONSUMER INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT

MITCHELL BREIT
MILBERG COLEMAN BRYSON
  PHILLIPS GROSSMAN, PLLC
405 East 50th Street
New York, New York 10022
(347) 668-8445

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................iii

INTRODUCTION................................................................................ 1

STATEMENT OF JURISDICTION ...................................................... 2

ISSUE FOR REVIEW ........................................................................ 3

    I.   Did the District Court err as a matter of law in dismissing Plaintiff's claims based on deceptive marketing and pricing of J&J's Rapid Release Gels on preemption grounds?

STATEMENT OF THE CASE ............................................................. 3

    I.   Acetaminophen Generally ...................................................... 4

    II.  J&J's Name Brand Acetaminophen: Tylenol® ........................ 5

    III. The Introduction and Deceptive Marketing of Rapid Release Tylenol® ................................................................ 6

    IV. J&J Profits from its Deceptive Marketing and Pricing ............ 11

    V.  J&J's Rapid Release Gels Work Slower Than Traditional Acetaminophen Counterparts ............................ 12

    VI. Plaintiff's and Putative Class Members' State Law Claims ................................................................................. 13

    VII. The District Court Dismissed the Claims On Preemption Grounds ............................................................. 13

SUMMARY OF THE ARGUMENT ..................................................... 15

ARGUMENT ..................................................................................... 16

    I.   FDCA Preemption Generally. .................................................. 16

II.    The District Court Summarily and Erroneously Rejected Plaintiff's Preemption Argument Regarding Marketing and Pricing..............................18

III.    Legislative History Clearly Demonstrates That Marketing and Advertising Claims Like Plaintiff's Are Not Preempted. ...................................................19

IV.    Case Precedent Supports Plaintiff's Preemption Position. ...........................................................20

CONCLUSION ...........................................................29

REQUEST FOR ORAL ARGUMENT....................................29

CERTIFICATE OF COMPLIANCE........................................31

ADDENDUM ...........................................................32

# TABLE OF AUTHORITIES

Page(s)

Cases

*23-34 94th St. Grocery Corp. v. New York City Bd. of Health*,
   685 F.3d 174 (2d Cir. 2012) ................................................................16

*Altria Grp., Inc. v. Good*,
   555 U.S. 70 (2008) ...............................................................................18

*Cipollone v. Liggett Grp.*,
   505 U.S. 504 (1992) .............................................................................16

*Corra v. Energizer Holdings, Inc.*,
   962 F. Supp. 2d 1207 (E.D. Cal. 2013) ...............................20, 21, 22, 28

*Crozier v. Johnson & Johnson Consumer Cos.*,
   901 F. Supp. 2d 494 (D.N.J. 2012) .....................................................27

*Horti v. Nestle Healthcare Nutrition, Inc.*,
   No. 22-16832, 2023 WL 8613601 (9th Cir. Dec. 13, 2023)..................25

*In re Epogen & Aranesp Off–Label Mktg. and Sales Pracs. Litig.*,
   MDL No. 08–1934, 2009 WL 1703285 (C.D. Cal. June 17, 2009) .......26

*Jovel v. i-Health, Inc.*,
   No. 12-CV-5614 JG, 2013 WL 5437065 (E.D.N.Y. Sept. 27, 2013)......26

*Maryland v. Louisiana*,
   451 U.S. 725 (1981)..............................................................................16

*Moore v. Trader Joe's Co.*,
   4 F.4th 874 (9th Cir. 2021) .................................................................26

*Pac. Cap. Bank, N.A. v. Connecticut*,
   542 F.3d 341 (2d Cir. 2008) ................................................................16

Statutes

21 U.S.C. § 301 ................................................................................ 15, 17

21 U.S.C. § 379r.................................................................................. *passim*

28 U.S.C. §1332(d) ...................................................................................... 2

28 U.S.C. § 1291 .......................................................................................... 2

28 U.S.C. § 1294 .......................................................................................... 2

NY Gen. Bus. Law § 349 ........................................................................... 13

NY Gen. Bus. Law § 350 ........................................................................... 13

Other Authorities

1997 U.S.C.C.A.N. 2880 ............................................................................ 20

1997 U.S.C.C.A.N. 2893 ............................................................................ 20

H.R. Conf. Rep. 105-399 ........................................................................... 20

Constitutional Provisions

U.S. Const. art. VI, cl. 2 .......................................................................... 16

## INTRODUCTION

Defendant Johnson & Johnson Consumer, Inc. ("J&J") introduced Tylenol® Extra Strength Rapid Release Gels ("Rapid Release Gels") in 2005. J&J's marketing and pricing led reasonable consumers to believe that "rapid release" means that the drug works faster for consumers than non-rapid release products—even though J&J has long known that traditional, non-rapid release acetaminophen products can be equally effective in the same time period—if not *faster*. J&J sells its Rapid Release Gels with false, misleading, and deceptive marketing and pricing to dupe consumers into purchasing the Rapid Release Gels for prices that exceed their true value.

Plaintiff and the putative Class Members are consumers who were misled or deceived by J&J's false, deceptive representations and, as a result, purchased the Rapid Release Gels. Had Plaintiff and the putative Class Members known the truth about the Rapid Release Gels—that they do not work faster than traditional acetaminophen products, as marketed—they would not have purchased them or else would have paid substantially less for them. As a result, Plaintiff filed this class action.

1

The District Court concluded that Plaintiff's claims were preempted by the Federal Food, Drug, and Cosmetic Act ("FDCA") and therefore dismissed them with prejudice. But the dismissal on preemption grounds was an error of law. Plaintiff's claims are based on J&J's false and misleading *marketing* and *pricing*, both of which are *not* in conflict with or preempted by the FDCA. This Court should reverse and remand the District Court's order dismissing all claims.

## STATEMENT OF JURISDICTION

The United States District Court for the Southern District of New York had original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d), because at least one member of the proposed class is a citizen of a state different from J&J; the amount in controversy exceeds $5,000,000, exclusive of interests and costs; the proposed class consists of more than 100 members; and none of the exceptions under the subsection apply to this action. The District Court issued a final judgment in this case on August 28, 2024. Plaintiff filed a notice of appeal on September 24, 2024, such that this Court has appellate jurisdiction pursuant to 28 U.S.C. §§ 1291, 1294.

## ISSUE FOR REVIEW

I.    Did the District Court err as a matter of law in dismissing Plaintiff's claims based on deceptive marketing and pricing of J&J's Rapid Release Gels on preemption grounds?

## STATEMENT OF THE CASE

J&J produces, manufactures, markets, and distributes over-the-counter products to families, children, and other consumers worldwide, including analgesic or pain-relieving medicines under the Tylenol® brand name. A-9 ¶ 1.  In 2005, J&J introduced its Rapid Release Gels specially designed with "laser-drilled holes to release medicine quickly." A-9 ¶ 2. Since 2005, J&J has misled and continues to mislead consumers about the nature, quality, and effectiveness of its so-called Rapid Release Gels. J&J explicitly promises faster relief than was available before that product was introduced, and J&J goes to great lengths to convince consumers that its Rapid Release Gels work faster than other acetaminophen products, using marketing statements like this one:

3



A-9-10 ¶ 3.

A recent study demonstrates what J&J has long known its Rapid Release Gels actually dissolve *more slowly* than its non-rapid release products. A-10 ¶¶ 5-6. Despite this, J&J charges a premium for its Rapid Release Gels and uses misleading marketing to dupe consumers into purchasing the gels for prices that exceed their true value. A-10-11 ¶¶ 7-8.

## I.    Acetaminophen Generally

Acetaminophen, also called paracetamol or N-acetyl-para-aminophenol ("APAP"), is an over-the-counter ("OTC") pain reliever and fever reducer that comes in a variety of forms: liquid suspension, tablets, capsules, and gelcaps. A-12 ¶ 17. Acetaminophen is used to treat a variety of common conditions including headaches, muscle aches, arthritis, backaches, toothaches, colds, fevers, chronic pain, etc. A-12 ¶

4

18.   Consequently, acetaminophen is one of the most commonly used drugs in the world when it comes to pain mitigation, representing an estimated global market value of over $350 million annually. A-13 ¶ 19. Given the widespread use of acetaminophen, both the quality and value of acetaminophen products present important public health, consumer safety, and economic concerns.  A-13 ¶ 20.

## II.   J&J's Name Brand Acetaminophen: Tylenol®

J&J is one of the largest consumer health and personal care products companies in the world, with Tylenol® as one of its most familiar product lines. A-14 ¶ 24. Tylenol® products have had great success. In 1979, Tylenol became the bestselling product in the health and beauty aid category in the United States.  A-14 ¶ 27.  In fact, as of 2005, adult Tylenol was the "fastest-growing brand in the Internal Analgesics category—making it a bigger brand than Crest, Gillette, Dove, or Listerine."  A-14-15 ¶ 27.  At that time, consumers purchased Tylenol "in such record numbers that it ha[d] bec[o]me the only pharmaceutical franchise over $1 billion available without a prescription." A-14-15 ¶ 27.  In 2022, J&J's full year sales for all products totaled about $94.9 billion.  A-14-15 ¶ 27.

### III. The Introduction and Deceptive Marketing of Rapid Release Tylenol®

J&J introduced the Rapid Release Gels in 2005 and described them as specially designed with "laser-drilled holes to release medicine quickly." A-16-17 ¶¶ 36-37. Advertisements described the Rapid Release Gels as allowing "the release [of] powerful medicine even faster than before:



A-17 ¶ 38. The claim that the Rapid Release Gels work even faster than before became associated with the Tylenol® Extra Strength Rapid Release Gels. A-17 ¶ 39. In fact, a brand case study even described the

gels as "a new form of Tylenol that releases pain medicine even faster than before." A-17 ¶ 39.

In 2009, the Rapid Release Gels were recalled (for reasons not alleged here) and were not re-released until 2017. A-17 ¶ 40. The national return to the market of the Rapid Release Gels represented Tylenol's "biggest product launch in years" and, thus, the marketing campaign "involved triple the investment" that J&J would normally spend. A-18 ¶ 41. The marketing campaign encouraged consumers to find "fast working pain relief." A-18 ¶ 42. "In the first month, [the campaign] reached over 25 million shoppers on their mobile device across five key markets, resulting in both category and Tylenol share growth at Walgreens." A-18 ¶ 43. In stores, the campaign inundated consumers with its messaging, "from displays in-aisle to endcaps to the pharmacy counter to checkout" and even "motion-activated video units." A-18 ¶ 44. Customers were also targeted "via Walgreens.com, email blasts, the retailer's Facebook page, a Google campaign, FSIs and paid search." A-18 ¶ 45. The campaign's "success was measured largely on brand share and category growth, and it exceeded expectations on these measures." A-18 ¶ 46.

7

With its marketing, product labeling, and affirmative representations, J&J sought and continues to seek to further this falsehood: that Rapid Release Gels provide faster relief than other cheaper, non-rapid release acetaminophen products. A-18 ¶ 47. J&J did this not only by explicitly making the claim but also by using buzzwords and imagery that emphasized the speed, fast-acting nature, and unique laser-drilled holes of the Rapid Release Gels. A-18-19 ¶ 48. For example, J&J advertised the Rapid Release Gels by claiming that it "works at the speed of life" and that "only Tylenol® Rapid Release Gels have laser-drilled holes" that "release medicine fast for fast pain relief":



A-19 ¶ 49. Moreover, J&J ran a commercial with racecar drivers to emphasize the speed of Rapid Release Gels. The commercial depicted drivers using Rapid Release Gels as being faster than their competitors

8

who did not use the Rapid Release Gels.  A-19 ¶ 50.  Other marketing statements include, but are not limited to, the following:

    a.    "TYLENOL® Rapid Release Gels start to dissolve in seconds and effectively relieve pain at rapid speed. Its unique laser drilled holes help release medicine faster!"

    b.    "Rapid release. Rapid relief."

    c.    "Fast Working Pain Relief."



    d.    "New Tylenol® Rapid Release Gels. Gelcaps with specially designed holes to release powerful medicine even faster than before."

A-19-20 ¶ 51.

J&J's false, misleading, and deceptive marketing campaign has been successful in getting the public to believe that the Rapid Release Gels are faster products, when in fact they are *slower* than their regular

9

counterparts. A-20-21 ¶ 52. Consumer reviews and comments indicate that consumers have been deceived or confused by J&J's representations; are likely to be deceived or confused given J&J's representations; and some even notice after purchase that the Rapid Release Gels do not work faster than regular, non-rapid release acetaminophen Tylenol® products that are cheaper. A-21 ¶ 55. Examples include:





A-21 ¶ 55.

## IV.   J&J Profits from its Deceptive Marketing and Pricing

J&J has profited and continues to profit greatly from the Tylenol® product line.  But J&J's profitability on the Rapid Release Gels comes at much too high a price, both figuratively and literally: consumer deception about the true nature, quality, and value of the product.  J&J sells its Rapid Release Gels at a higher price than its other equally effective and equally fast-acting acetaminophen products that are not classified as "rapid release." A-15 ¶ 30.  For example, at the time of filing Plaintiff's complaint, a regularly priced 100-count bottle of Tylenol Extra Strength Rapid Release Gels cost $13.99, while a regularly priced 100-count bottle of Tylenol Extra Strength caplets cost $12.99 and a regularly priced 100-count bottle of Tylenol Regular Strength tablets cost $12.49.  A-15-16 ¶ 31 (illustrating prices at CVS's retail locations and website).  Similarly, on Amazon, a regularly priced 100-count bottle of Tylenol® Extra Strength Rapid Release Gels cost $12.47 (or $0.12/gelcap), while a regularly priced 225-count bottle of Tylenol® Extra Strength caplets cost $18.34 (or $0.08/caplet—half the price). A-16 ¶ 32.  Consumers have been willing to and continue to pay this premium because, as a result of J&J's false, misleading, unfair, and/or

11

deceptive labeling and other advertising, they believe that the Rapid Release Gels work faster than other, cheaper acetaminophen products when in fact they do not. A-16 ¶ 34. This comparative deception is particularly prevalent when the Rapid Release Gels are sold in stores, where they are displayed alongside regular, non-rapid release Tylenol® products, where the difference in price is immediately apparent to the consumer—and promotes the false belief that the "rapid release" quality of the Rapid Release Gels is worth a more (when, in fact, it is not). A-18 ¶ 44n.37.

## V. J&J's Rapid Release Gels Work Slower Than Traditional Acetaminophen Counterparts

Despite what J&J represents to the public about the Rapid Release Gels, they do not work faster than other, cheaper Tylenol® acetaminophen products. A 2018 study of the "rapid release" or "fast release" claims of acetaminophen products, including Tylenol® Extra Strength Rapid Release Gels, revealed that these products not only fail to work faster, they actually work *slower* than their traditional acetaminophen counterparts, such as tablets. A-24 ¶ 57. The 2018 study demonstrates that J&J's representations and marketing are false, misleading, deceptive, and unfair. A-24 ¶ 58.

### VI. Plaintiff's and Putative Class Members' State Law Claims

J&J's conduct violates New York law. Specifically, J&J's conduct violates consumer protection laws and constitutes breach of warranties, and J&J has unjustly enriched itself to the detriment of consumers. J&J's conduct is ongoing and is the basis for Plaintiff's and the putative Class Members' allegations.

Plaintiff, individually and behalf of a putative class, brought the following claims: violation of New York General Business Law § 349 (prohibiting "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service"), New York General Business Law § 350 (prohibiting "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service"), unjust enrichment, and declaratory relief. *See* A-23-39 ¶¶ 92-134.

### VII. The District Court Dismissed the Claims On Preemption Grounds.

On December 12, 2023, J&J moved to dismiss the complaint, arguing that all claims were expressly preempted under 21 U.S.C. § 379r(a) because they depend upon state requirements that are different

13

from, in addition to, or not identical with the federal government's requirements and regulatory standards about drug labeling. A-42. Specifically, J&J argued that the Rapid Release Gels conformed to a federal dissolution standard for "immediate" release medications, and thus the claims were preempted. ECF 38, at 8.

Plaintiff opposed the motion, arguing: (1) that a federal regulation regarding "immediate" release did not expressly preempt a claim for misleading labeling as to "rapid" release (a label claim for which there were no regulations); and (2) federal regulations otherwise did not preclude claims for deceptive marketing and pricing. ECF 41, at 5-10.

On August 27, 2024, the District Court granted J&J's motion to dismiss, concluding that a federal regulation regarding the label claim "immediate release" necessarily included the label claim "rapid release." With respect to Plaintiff's marketing and pricing theory, the District Court held only as follows:

> To hold that the FDA's regulation of acetaminophen dissolution rates ought not control simply because a drug producer markets or prices several of its qualifying "immediate release" products in varying manners would be to create an end-run around the FDCA's express preemption clause.

A-107. Plaintiff now appeals from that order.

14

## SUMMARY OF THE ARGUMENT

The District Court erred as a matter of law by dismissing Plaintiff's claims based on preemption. Where no federal requirement exists or applies to a given product, federal law cannot preempt a claim regarding that product. Plaintiff's claims are premised not just on J&J's false and misleading labeling, but also on its false and misleading *marketing* and *pricing*. While the Federal Food, Drug, & Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq.*, establishes labeling requirements that the District Court concluded applied to the Rapid Release Gels, it *does not* establish requirements for or govern the marketing and pricing of OTC acetaminophen drugs. Legislative history and case precedent make clear that claims like Plaintiff's are not governed by and, therefore, are not in conflict with or preempted by the FDCA. The claims do not create (and could not create) any requirements that are additional to or different from those requirements imposed by the FDCA because the claims are based on subjects not governed by the FDCA. This Court should reverse

15

the District Court's order dismissing all claims and remand for further proceedings.[1]

## ARGUMENT

### I.  FDCA Preemption Generally.

Article VI of the Constitution of the United States provides that the laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. CONST. ART. VI, cl. 2.  Thus, state law that conflicts with federal law is "without effect."  *Cipollone v. Liggett Grp.*, 505 U.S. 504, 516 (1992) (citing *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)); *see also Pac. Cap. Bank, N.A. v. Connecticut*, 542 F.3d 341, 351 (2d Cir. 2008) (quoting U.S. Const. art. VI, cl. 2).

Preemption is traditionally categorized as either "express," "conflict," or "field" preemption: Congress's intent may be "explicitly stated in the statute's language or implicitly contained in its structure and purpose."  *Id.* at 516.  In the absence of an express congressional

---

[1] Plaintiff does not appeal the District Court's first conclusion, which was the bulk of its analysis: that Plaintiff's claim about the label claim "rapid release" being false or misleading was preempted because the regulation governing labeling of "immediate release" products necessarily covered "rapid release" products.

command, state law is pre-empted if that law actually conflicts with federal law, or if federal law so thoroughly occupies a legislative field "'as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Id.* (internal citations omitted). A district court's preemption determination is a conclusion of law and is reviewed *de novo. 23-34 94th St. Grocery Corp. v. New York City Bd. of Health*, 685 F.3d 174, 180 (2d Cir. 2012) (citations omitted).

Before the District Court, J&J contended (and the District Court agreed) that Plaintiff's claims were expressly preempted by the FDCA, 21 U.S.C. §§ 301 *et seq*. The FDCA contains an express preemption clause for OTC drugs that preempts "any requirement" that is "different from or in addition to" or "otherwise not identical with" the FDCA:

> [N]o State or political subdivision of a State may establish or continue in effect any requirement – (1) that relates to the regulation of a drug that is not subject to the requirements of section 353(b)(1) or 353(f)(1)(A) of this title [including OTC drugs]; and (2) is different from or in addition to, or that is otherwise not identical with, a requirement under this chapter.

21 U.S.C. § 379r(a).

21 U.S.C. § 379r(a), however, does not dispose of Plaintiff's claims where, as here, no federal requirement exists or applies to a given claim

17

about a product. As discussed in detail below, Plaintiff's claims are premised in part on J&J's false and misleading *marketing* and *pricing*, areas not in conflict with or preempted by the FDCA.

## II. The District Court Summarily and Erroneously Rejected Plaintiff's Preemption Argument Regarding Marketing and Pricing.

Plaintiff's and the putative Class Members' claims arise from J&J's deceptive marketing and pricing of its Rapid Release Gels to consumers, causing injury to consumers purchasing the products in New York. *See* A-15-25 ¶¶ 29-63. Courts should be wary of finding preemption "in a field traditionally occupied by the States, such as the regulation of advertising." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008).

When considering identical claims of preemption for similar "rapid release" acetaminophen gelcaps, another court recognized this fact, explaining that 21 C.F.R. § 201.326 regulated the labeling and warning requirements of OTC acetaminophen products; however, the court noted, that provision did not apply to the plaintiff's claims that the defendant had deceptively marketed and priced the rapid release gelcaps. *See Edwards v. Walmart, Inc.*, No. 18-9655-GW (C.D. Cal. Apr. 18, 2019), ECF No. 50, at 7 (copy of opinion attached in addendum) (denying motion

18

to dismiss in case involving generic versions of rapid release acetaminophen products). The *Edwards* court explained: "the Defendant has not thus far provided any binding regulation (or other applicable federal law) that would preempt Plaintiffs' state law claims." *Id*.

In a single page analysis, the District Court here rejected Plaintiff's reliance on *Edwards* but did not cite any authority contradicting the *Edwards* court's reasoning. Instead, the District Court summarily, and without explanation, deemed Plaintiff's preemption argument as "unworkable" and an attempt to create an "end-run" around preemption. A-107. As support, the court cited only a Tulane Law Review article about preemption generally. A-107. In fact, the principles that underlie the *Edwards* decision and Plaintiff's preemption position here are not novel or meritless.

### III. Legislative History Clearly Demonstrates That Marketing and Advertising Claims Like Plaintiff's Are Not Preempted.

The legislative history of 21 U.S.C. § 379r makes it clear that Congress did not intend to preempt claims like those presented by Plaintiff. The House Conference Report included a comment explicitly

addressing the effect of Section 379r of the FDCA on state false advertising claims when the section was added in 1997:

> All states have laws prohibiting false and misleading advertising, modeled on the Federal Trade Commission Act. These laws have been applied to prohibit unsubstantiated claims for nonprescription drugs and cosmetics, and to require corrective advertising. This provision is not intended to preempt the application of these laws under such circumstances.

> The Conference Committee intends to make clear that "Little FTC" laws, as they have historically been written and applied, are not preempted. The scope of national uniformity is modified to only apply to state requirements that relate to labeling and packaging or, if they go beyond labeling and packaging, to requirements relating to warnings. Thus, advertising issues relating to claims substantiation, fair balance, and misleading or deceptive claims are outside the scope of preemption.

H.R. Conf. Rep. 105-399, 103, 1997 U.S.C.C.A.N. 2880, 2893. In light of this legislative history, it is clear that 21 U.S.C. § 379r was not meant to preempt claims like Plaintiff's—which are about the false and misleading advertising, marketing, and pricing.

## IV. Case Precedent Supports Plaintiff's Preemption Position.

In *Corra v. Energizer Holdings, Inc.*, 962 F. Supp. 2d 1207, 1211 (E.D. Cal. 2013), the plaintiff alleged that the defendants, the makers of Banana Boat sunscreen products, engaged in false, misleading, and

deceptive messaging to consumers by leading consumers to believe that the Banana Boat SPF 85–110 collection provided superior protection compared to lower SPF products, including SPF 50 products. The plaintiff contended that "'[t]here are only two material differences between the Products in the Banana Boat SPF 85–110 collection and the Banana Boat SPF 50 Products: (1) the SPF values; and (2) the price. The Banana Boat SPF 85–100 collection retails for a premium over comparable lower SPF products, including the Banana Boat SPF 50 Products." *Id.* The district court determined that the plaintiff's claims were *not* preempted:

> Defendants point to the fact that the regulation promulgated by the Final Rule expressly provides that the numerical SPF value resulting from the FDA-mandated SPF testing procedure must be placed on a sunscreen product's principal display panel, *see* 21 C.F.R. § 201.327(a)(i)(A), (ii), and does not expressly include SPF ratings above 50 as being a false or misleading claim. *See id.*, § 201.327(c)(3), (g). Defendants contend that because the testing procedure resulted in SPF values of 85 to 110 for the products in their SPF 85–110 collection, those values were required to be placed on the products' labels pursuant to 21 C.F.R. § 201.327(a)(i). From this, Defendants further contend that "Plaintiff seeks to impose a different state requirement, one that would prohibit use of SPF values above 50, which [the] FDA currently requires," the implication being it would be impossible for Defendants to simultaneously comply both with FDA regulations governing labeling and any heightened duty it

21

could conceivably be adjudged to have under California's UCL and CLRA jurisprudence.

The Court does not agree. First, Plaintiff is not attempting to enforce any sort of state labeling requirement by seeking to prohibit the use of SPF ratings above 50, as Defendants contend, because Plaintiff's position is *not* that the SPF 85–110 ratings on Defendants' products are themselves per se false or misleading. Rather, Plaintiff alleges the way Defendants marketed their sunscreen products *beyond* simply providing an SPF rating—in effect, combining the use of SPF ratings with price differentials and claims of proportionally greater protection—misled consumers into purchasing more expensive, higher SPF-rated products even though, according to Plaintiff, these products did not provide proportionally greater protection than less expensive, lower SPF-rated products. If Plaintiff were to prevail under the UCL and CLRA, Defendants' SPF labeling duties would remain unchanged.

Second, to the extent Defendants intend to argue that 21 C.F.R. § 201.327 encompasses the general duty not to engage in false or misleading advertising—and preempts the UCL and CLRA on this issue—in that the C.F.R. accounts for all claims by a sunscreen purveyor that could conceivably be deemed false or misleading (i.e., claims not expressly accounted for in the C.F.R., such as those alleged by Plaintiff, could not by virtue of preemption be deemed false or misleading under the UCL or CLRA), the argument is likewise without merit. As to claims on sunscreen products considered to be false and/or misleading, the C.F.R. prefaces the (brief) list of delineated claims with the phrase "[t]hese claims include but are not limited to[.]" 21 C.F.R. § 201.327(g). The inclusion of this phrase means the list of delineated claims is not exclusive to other claims, and, in the Court's view, clearly evinces no intent to preempt state consumer fraud claims. Accordingly, the Court shall not find Plaintiff's claims expressly preempted.

22

*Id.* at 1214-15.

The exact same reasoning applies to Plaintiff's claims in this case. Plaintiff's central claim is not that the labels for the Rapid Release Gels "are themselves per se false or misleading," the claim is that "the way [J&J] marketed their [acetaminophen] products *beyond* simply [describing them as 'rapid release']"—in effect, combining the use of [that description] with price differentials and claims of proportionally [faster pain relief]—misled consumers into purchasing more expensive, [rapid release] products even though, according to Plaintiff, these products did not provide proportionally [faster pain relief] than less expensive, [non-rapid release] products." *See id.* As in *Corra*, Plaintiff here is not trying to force the manufacturer to comply with some "heightened duty" about labeling more restrictive than that contained in the FDCA.

Plaintiff's claims are based on New York law that prohibits false and misleading advertising of products. Plaintiff and the putative Class Members are not attempting to enforce any sort of state labeling requirement by seeking to prohibit the use of the term "rapid release." Rather, Plaintiff and putative Class Members' position is that the way J&J marketed its Rapid Release Gels has gone beyond simply using the

23

term "rapid release"—in effect, combining the use of the term with price differentials and marketing terms of proportionally greater protection. This effort misled consumers into purchasing more expensive, but less effective, products—all based on J&J's conduct beyond its label, including its placement of the Rapid Release Gels alongside other cheaper, non-rapid release acetaminophen products; its marketing designed to engender among consumers a belief that Rapid Release Gels work faster than non-rapid release acetaminophen counterparts; and its establishment of a premium price for the "rapid release" quality of the Rapid Release Gels as compared to other cheaper, non-rapid release counterparts. All of these go beyond the product's label—and thus are not governed by, and cannot be preempted by, the FDCA.

For example, J&J advertises that the Rapid Release Gels allow for "the release [of] powerful medicine even faster than before." A-17 ¶ 38; *see also* A-17 ¶ 39. The marketing campaign associated with the products encouraged consumers seeking "fast working pain relief" to purchase the Rapid Release Gels, rather than traditional, non-rapid release acetaminophen products. A-18 ¶ 42. Indeed, the term "rapid release" is not even an FDA recognized term; it is a term J&J created for marketing

24

purposes, to instill in consumers the false belief (coupled with the product's premium price) that these products worked faster and more effectively. J&J reinforced this perception throughout its marketing campaign. *See* A-18-20 ¶¶ 48-51.

And this campaign proved successful, duping consumers into purchasing the products under the false belief that they provided faster relief. *See, e.g.,* A-21 ¶¶ 54-55. In reality, however, Rapid Release Gels do not provide a medicinal effect any faster than traditional (and cheaper) non-rapid release counterparts. In fact, Rapid Release Gels work *more slowly* than their cheaper, non-rapid release acetaminophen counterparts. A-24 ¶¶ 56-58. Despite being aware of this fact, J&J created its marketing campaign with the intention of tricking consumers into believing that the products worked faster and into paying a premium for the products under this false premise. A-24-25 ¶¶ 59-63. J&J even set a price premium of Rapid Release Gels compared to its traditional, non-rapid release counterparts, despite these counterparts performing just as quickly (if not *more quickly*) and effectively. A-15 ¶ 30. J&J did so while understanding that Rapid Release Gels would be displayed in stores next to other non-rapid release Tylenol® products, creating a

"contextual inference" that the premium priced products were more effective—particularly when coupled with J&J's marketing. *See* A-18 ¶ 44 n.37; *see also Horti v. Nestle Healthcare Nutrition, Inc.*, No. 22-16832, 2023 WL 8613601, at *2 (9th Cir. Dec. 13, 2023) (finding that defendant's alleged misrepresentations regarding a purported diabetes supplement, coupled with the fact that they were sold near other similar supplements, created a "contextual inference" as to their effectiveness, and therefore reversing dismissal by district court); *Moore v. Trader Joe's Co.*, 4 F.4th 874, 882-83 (9th Cir. 2021) (explaining that consumers' "contextual inferences" may be derived from the product itself, including its price).

In another district court case, one that addressed the misleading nature of advertising of supplements, the court determined that the plaintiff's allegations that the supplements at issue were claimed to support brain development and function, improve memory, support mental clarity, and protect against normal cognitive decline but did not actually do so were not preempted. *Jovel v. i-Health, Inc.*, No. 12-CV-5614 JG, 2013 WL 5437065, at *5 (E.D.N.Y. Sept. 27, 2013). "Although these statements are part of the products' labeling and may touch on an area regulated by the FDA, consumer protection claims founded on their

falsity are not preempted." *Id.* In its reasoning, the court emphasized that the FDCA is not focused on the truth or falsity of advertising claims. In fact, "'[t]he main purpose of the advertising restrictions set forth in the FDCA [ ] is not to protect consumers from deceptive advertising, but rather to further the FDCA's underlying goal of ensuring the safety of prescription drugs.'" *Id.* at *6 (quoting *In re Epogen & Aranesp Off–Label Mktg. and Sales Pracs. Litig.*, MDL 08–1934, 2009 WL 1703285, at *7 n.4 (C.D. Cal. June 17, 2009)). Likewise, even in cases where the FDCA preempts claims regarding package labeling, allegations concerning *advertising and marketing* can survive. *See, e.g., Crozier v. Johnson & Johnson Consumer Cos.*, 901 F. Supp. 2d 494, 503 (D.N.J. 2012) (holding that claims premised on advertising and marketing of defendant's Neosporin product as "oil–free" on the packaging, website, and marketing materials were not preempted).

The FDCA establishes labeling and warning requirements that would arguably apply to the Rapid Release Gels—but it does not establish requirements for or govern the marketing and pricing of OTC acetaminophen drugs. Here, Plaintiff's claims assert that J&J's marketing, pricing, and "contextual inference" placement of Rapid

27

Release Gels were designed to—and did—deceptively establish among consumers a false belief that the Rapid Release Gels worked faster and more effectively than other cheaper, traditional, non-rapid release acetaminophen products, despite J&J's knowledge that the Rapid Release Gels did not work faster or more effectively. These claims go beyond the labeling of the product.

J&J argues that merely because Plaintiff's claims rely on the deceptive nature of the "rapid release" claims, which happen to be included on the product's label, they must be preempted. This is simply not the law. Indeed, the FDCA does not preempt state laws that prevent companies from deceptively marketing, pricing, or placing their products. Plaintiff's claims, which would effectively prevent J&J from engaging in widespread deception and misrepresentation of its products to consumers in the hopes of charging an unfair price premium for a product attribute that does not work as advertised, do not create any additional requirements for J&J. Through its preemption arguments, J&J asserts that it "would be impossible for [it] to simultaneously comply both with FDA regulations governing labeling and any heightened duty it could conceivably be adjudged to have under [state law]" to truthfully market

its product to consumers. *Corra*, 962 F. Supp. 2d 1214. But that is not the case. *See id.* at 1214-15. The fact that the District Court here embraced and accepted these arguments was error. Instead, Plaintiff's claims primarily assert that J&J's marketing and pricing of the products are deceptive, and thus there is no preemption because her claims do not create (and could not create) any requirements that are additional to or different from those requirements imposed by the FDCA.

## CONCLUSION

Plaintiff's and the putative Class Members' claims are not preempted by 21 U.S.C. § 379r. Thus, the Court should reverse and remand.

## REQUEST FOR ORAL ARGUMENT

Plaintiff respectfully requests oral argument, which will aid the Court.

Respectfully submitted this 8th day of January 2025.

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**

 /s/ Mitchell M. Breit
Mitchell M. Breit
405 E. 50th Street

29

New York, NY 10022
Telephone: (630) 796-0903
mbreit@milberg.com

Adam A. Edwards
William A. Ladnier
Virginia A. Whitener
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0080
aedwards@milberg.com
wladnier@milberg.com
gwhitener@milberg.com

Mark Sigmon
900 W. Morgan Street
Raleigh, NC 27603
Telephone: 866-252-0878
msigmon@milberg.com

**SIMMONS HANLY CONROY LLP**

An Truong
Erin Gee
112 Madison Avenue, 7th Floor
New York, NY 10016
Telephone: (212) 784-6400
atruong@simmonsfirm.com
egee@simmonsfirm.com

*Attorneys for Plaintiff – Appellant*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 5,247 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

Dated: January 8, 2025

   /s/ Mitchell M. Breit
Mitchell M. Breit

# ADDENDUM

# TABLE OF CONTENTS

PAGE

*Edwards v. Walmart, Inc.*, No. 18-9655-GW
    (C.D. Cal. Apr. 18, 2019), ECF No. 50, at 7 . . . . . . . . . . . . . . . . . . . . . . . Add.1

# Add.1

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 18-9655-GW(FFMx) | Date | April 18, 2019 |
|---|---|---|---|
| Title | *Toya Edwards v. Walmart, Inc.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | Katie E. Thibodeaux | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:      Attorneys Present for Defendants:

Mitchell M. Breit             Jaikaran Sing
Justin J. Presnal

**PROCEEDINGS:**     **DEFENDANT WALMART, INC.'S MOTION DISMISS FIRST AMENDED CLASS ACTION COMPLAINT [24]**

Court hears oral argument. The Tentative circulated and attached hereto, is adopted as the Court's Final Ruling. The Court would DENY Defendant's Motion to Dismiss as to Plaintiffs' causes of action 1 through 3; GRANT it with leave to amend as to claims 4 through 7; and GRANT it without leave to amend as to claims 8 and 9.

The Court sets a scheduling conference for May 6, 2019 at 8:30 a.m., with a joint scheduling report to be filed by May 1, 2019.

|  | : | 25 |
|---|---|---|
|  | Initials of Preparer | JG |

# Add.2

_Edwards et al. v. Walmart, Inc._; Case No. 2:18-cv-09655-GW (FFMx)
Tentative Ruling on Motion to Dismiss First Amended Class Action Complaint


## I. Background

### A. Factual Background

Toya Edwards and Jamal Erakat (collectively, "Named Plaintiffs"), on behalf of themselves and all others similarly situated (collectively with Named Plaintiffs, "Plaintiffs"), sue Walmart, Inc. ("Walmart" or "Defendant") for: (1) violation of California False Advertising Law ("FAL"), Business and Professional Code ("BPC") § 17500; (2) violation of California Unfair Competition Law ("UCL"), BPC § 17200; (3) violation of California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1761; (4) violation of the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1799 _et seq._; (5) breach of implied warranty of merchantability under Universal Commercial Code ("UCC") § 2-314; (6) breach of express warranty under UCC § 2-313; (7) violation of the Magnuson-Moss Warranty Act ("MMWA") 15 U.S.C. §2301 _et seq._; (8) unjust enrichment; and (9) declaratory relief. _See generally_ First Amended Complaint ("FAC"), Docket No. 20. Plaintiffs allege the following relevant facts:

The Named Plaintiffs are both citizens of California. _Id._ ¶ 19-20. Walmart is a Delaware corporation, with its principle place of business located in Arkansas. _Id._ ¶ 21. Walmart is the world's largest retail company and operates thousands of stores worldwide. _Id._ ¶ 1.

As part of their health and wellness department, Walmart stocks and sells brand name and generic over-the-counter ("OTC") medications, including pain relievers, under its Equate™ ("Equate") brand. _Id._ ¶ 3-5. Acetaminophen is an OTC pain reliever and fever reducer that comes in a variety of forms: liquid suspension, tablets, capsules, and gelcaps. _Id._ ¶ 25. Acetaminophen is one of the most commonly used drugs in the world for pain mitigation, with an estimated global market value over $350 million annually. _Id._ ¶ 27. Tylenol© ("Tylenol") is the well-recognized brand name of acetaminophen and is produced, manufactured, and distributed by Johnson & Johnson Consumer, Inc. ("J&J"). _Id._ ¶ 29.

In 2005, J&J introduced name brand Tylenol Extra Strength Rapid Release Gels to the American public as "specially designed" gelcaps "with holes to allow the release of powerful medicine even faster than before." _Id._ ¶ 6. In 2008, Tylenol launched Tylenol PM Rapid Release Gels using similar marketing. _Id._ The claim that rapid release gelcaps work faster than typical

# Add.3

Tylenol tablets, became associated with regular and PM versions of Tylenol Extra Strength Rapid Release Gels. *Id.* ¶ 35. In 2009, the rapid release gels were recalled and were not re-released until 2017. *Id.* ¶ 36. The return of the rapid release gels to market was Tylenol's "biggest product launch in years" and "involved triple the investment" of a typical J&J product release. *Id.* ¶ 37. J&J's marketing campaign reached over 25 million shoppers across five key markets. *Id.* ¶ 38. With its marketing, product labeling, and affirmative representations, J&J sought and continues to seek to further the inaccurate perception that rapid release Tylenol actually provides faster relief than other cheaper acetaminophen products. *Id.* ¶ 39.

Generic brands like Equate seek to mimic the product offerings of J&J by selling generic versions of Tylenol for a price less than the name brand equivalent. Id. ¶ 31. Sales of generic versions of Tylenol products have been profitable for Walmart. Id. ¶ 32. Walmart sells its own version of Tylenol Extra Strength Rapid Release Gels called Equate Extra Strength Acetaminophen Rapid Release Gelcaps. *Id.* ¶ 7. Walmart also sells its own version of the Tylenol Extra Strength PM Rapid Release Gels called Equate Extra Strength Acetaminophen PM Rapid Release Gelcaps. *Id.* ¶ 8. Walmart relied on J&J's "massive marketing campaign" and the success of its rapid release product when it released its rapid release gelcaps. *Id.* ¶ 57. Consumers were already familiar with the claims that Tylenol rapid release products were "fast-acting" when Walmart released it's generic Equate versions of the medications. *Id.* ¶ 61. The Equate rapid release gelcaps are marketed as comparable to Tylenol Extra Strength Rapid Release gels, even though, on information and belief, they do not contain the unique laser drilled holes of the name brand version. *Id.* ¶ 10. The Equate gels are also designed to look the same or similar as the Tylenol rapid release products. *Id.* ¶ 58-60.

Walmart sells Equate rapid release gels at a higher price than its non-rapid release acetaminophen tablets. *Id.* ¶ 14. Walmart has long known, or should have known, that traditional, non-rapid release acetaminophen products can be equally effective, in the same, if not faster, time-period as its rapid release products. *Id.* ¶ 12. A new study ("Study") demonstrates that Equate rapid release acetaminophen gelcaps dissolve slower than Equate non-rapid release tablets. *Id.* ¶ 13. There is no proven significant efficacy difference between Equate rapid release gelcaps and Equate non-rapid release products. *Id.* ¶ 72. Walmart has done nothing to correct the impression that rapid release gelcaps work faster than other, cheaper acetaminophen products, and has sought to further consumer misperception through its own deceptive labeling and marketing. *Id.* ¶¶ 62-

2

**Add.4**

63.  The packaging for Equate rapid release gelcaps associates the product with the name-brand Tylenol equivalents.  *Id.* ¶¶ 58-64.  Walmart also advertises the Equate rapid release gelcaps using the phrase "rapid release."  *Id.* ¶ 65.  Consumers try the Equate rapid release gelcaps because they are labeled "rapid release" and because they are cheaper than Tylenol's rapid release products.  *Id.* ¶ 66.

Plaintiff Edwards began purchasing Equate Extra Strength Acetaminophen Rapid Release Gelcaps "about two years ago" based on her doctor's suggestion that the rapid release product would alleviate her pain faster.  *Id.* ¶ 77-79.  She purchased the rapid release gelcaps rather than less expensive Equate acetaminophen products because the advertising and labeling of the products, which included phrases such as "rapid release" and "rapid relief," led her to believe that the rapid release gelcaps would provide faster pain relief.  *Id.* 82-83.  Had Edwards known that the rapid release gelcaps did not work any faster than traditional Equate acetaminophen products, she would not have been willing to pay the premium Walmart charges for the rapid release gelcaps.  *Id.* ¶ 84.

Plaintiff Erkat has been buying Equate Extra Strength Acetaminophen Rapid Release PM Gelcaps for the last two years.  *Id.* ¶ 86-88.  He purchased the rapid release gelcaps over other Equate acetaminophen products solely, or in part, because they were advertised as "rapid release" and offering "rapid relief."  *Id.* ¶ 89.  Erkat would not have bought the more expensive gelcaps if he had known that the product did not work faster than traditional, cheaper acetaminophen products.  *Id.* 92.

Plaintiffs bring this action individually and as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).  *Id.* ¶ 96.  Plaintiffs propose a California Class defined as: "During the fullest period allowed by law, all persons who purchased the Class Rapid Release Gelcaps in the State of California."  *Id.* "Class Rapid Release Gelcaps" include "Equate Extra Strength Acetaminophen Rapid Release Gelcaps, and any other Equate or Walmart brand acetaminophen product labeled and/or marketed as 'rapid release.' "  *Id.* ¶ 98.

**B. Procedural Background**

Plaintiffs filed a Complaint on November 15, 2018, *see* Complaint, Docket No. 1, and subsequently filed a First Amended Complaint on January 11, 2019.  *See* FAC.  Defendant filed a motion to dismiss.  *See* Notice of Motion and Defendant's Notice of Motion and Motion to Dismiss First Amended Class Action Complaint ("MTD"), Docket No. 24.  Attached to the MTD,

# Add.5

Defendant filed a Request for Judicial Notice of eight exhibits. *See* Request for Judicial Notice in Support of Walmart, Inc.'s Motion Dismiss First Amended Complaint ("RJN") (grammatical errors contained in original), Docket No. 24-2. Plaintiffs filed an opposition to Defendant's MTD. *See* Plaintiffs' Opposition to Defendant Walmart's Motion to Dismiss First Amended Class Action Complaint ("MTD Opp."), Docket No. 27. Defendant filed a reply in support of the MTD. *See* Reply Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss First Amended Class Action Complaint, Docket No. 28.

## II. Legal Standard

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.").

In deciding a 12(b)(6) motion, a court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). The court must construe the complaint in the light most favorable to the plaintiff, accept all allegations of material fact as true, and draw all reasonable inferences from well-pleaded factual allegations. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). The court is not required to accept as true legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where a plaintiff facing a 12(b)(6) motion has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the motion should be denied. *Id.*; *Sylvia Landfield Trust v. City of Los Angeles*, 729 F.3d 1189, 1191 (9th Cir. 2013). But if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] . . . the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (citations omitted).

### III. Analysis

#### A. Preemption

Defendant argues that Plaintiffs' claims are expressly preempted by the National Uniformity for Nonprescription Drugs Statute, 21 U.S.C. § 379r.  *See* MTD at 5.  Under the Supremacy Clause, "state law that conflicts with federal law is without effect."  *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (citing U.S. CONST. art. VI, cl. 2).  Federal preemption of state law, however, "will not lie unless it is the clear and manifest purpose of Congress." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (citation omitted).  If a federal statute contains an express preemption clause, the plain wording of the clause necessarily indicates the best evidence of Congress' preemptive intent.  *Id.*  Section 379r(a) provides that states may not "establish or continue in effect − any requirement (1) that relates to the regulation of a drug that is not subject to the requirements of [21 U.S.C.] Section 353(b)(1) or 353(f)(1)(A) [[1]] ; and (2) that is different from or in addition to, or that is otherwise not identical with, a requirement under [the FDCA] . . . ."  21 U.S.C. § 379r(a).  Section 379r contains a savings clause, which exempts from its preemptive scope "any action . . . under the product liability law of any State." *Id*. § 379r(e).  Section 379r would cover OTC drugs.[2]

Here, all of Plaintiffs' state law claims (claims 1-6, 8 and 9) are premised on the contention that Defendant misled consumers by branding its Equate acetaminophen gelcaps as "rapid release" when in fact the gelcaps dissolved more slowly than the less expensive regular Equate acetaminophen tablets that were not labeled "rapid release."  *See generally*, FAC.  Plaintiffs argue that their claims cannot be pre-empted because the FDA regulations are "silent" with regard to "rapid release" acetaminophen.  MTD Opp. at 1.

Defendant contends that there is a federal regulatory regime enacted and enforced by the FDA which governs OTC medication labeling and marketing.  *See* MTD at 7-8, citing 21 C.F.R. §§ 330 *et seq.*  FDA regulations govern the criteria that must be met in order for an OTC drug such as acetaminophen to be considered "safe, effective and not misbranded."  *Id.* § 330.1.  Any OTC drug which fails to conform to each of the conditions contained in the FDA regulations or in an

---

[1] Section 353(b)(1) deals with dangerous prescription drugs which require medical professional supervision and Section 353(f) covers veterinary prescription drugs.

[2] Additionally, federal law does require that OTC "labeling shall be clear and truthful in all respects and may not be false or misleading in any particular."  21 C.F.R. § 330.10(a)(4)(v).

# Add.7

applicable monograph can be subject to FDA regulatory action. *Id.* Defendant argues that the FDA has specifically regulated OTC drugs such as acetaminophen through a 1988 tentative final monograph titled "Internal Analgesic, Antipyretic, and Antirheumatic Drug Products for Over-the-Counter Human Use" ("1988 TFM"), citing to 21 C.F.R. § 343. *See* MTD at 8-9. However, contrary to the assertions of Defendant, there is no 21 C.F.R. §343.[3] The relevant portion of the TFM (as cited by Defendant) only regulates the dissolution standards applicable to asprin, *see* § 343.90; it does not regulate the dissolution standards applicable to acetaminophen. *See id.*

Defendant further asserts that acetaminophen dissolution standards are specifically set out in two FDA guidance documents[4]: (1) "Dissolution Testing and Acceptance Criteria for Immediate-Release Solid Oral Dosage Form Drug Products Containing High Solubility Drug Substances" ("Dissolution Testing guidance"), *see* Ex. A to MTD, Docket No. 24-3, and (2) "Waiver of In Vivo Bioavailability and Bioequivalence Studies for Immediate-Release Solid Oral Dosage Forms Based on a Biopharmaceutics Classification System" ("Waiver of Studies guidance"), *see* Ex. B to MTD, Docket No. 24-4. The Court is unconvinced that the content of these guidance documents, without much more, would preempt Plaintiffs' state law claims. The guidance documents specifically indicate that they do not "establish any rights for any person and [are] not binding on FDA or the public." *See* Ex. A at 1; Ex. B at 1. The documents also state that the industry is permitted to use an "alternative approach if it satisfies the requirements of the applicable statutes and regulations." *Id.* At the top of each page of the guidance documents, is the bold header "Contains Nonbinding Recommendations." *See generally id.* Further, they also state: "FDA's guidance documents do not establish legally enforceable responsibilities." *Id.* at 2. This is hardly indicative of binding regulation warranting preemptive effect. *See Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 341-42 (3rd Cir. 2009) (finding that FDA policy statements "hardly" support a finding of preemption).

In addition, neither of the two cited documents indicates that they were intended to govern the branding/labeling of OTC drugs. The Dissolution Testing guidance states that it "is intended to describe when a standard release test and criteria may be used in lieu of extensive method

---

[3] There is 21 C.F.R. Part 343 which includes §§ 343.1 – 343.90, but none of those sections deals with acetaminophen.

[4] The Court will take judicial notice of the guidance documents given that they contain information from government agency websites. *See U.S., ex rel. Modglin v. DJO Global Inc.*, 114 F.Supp.3d 993, 1008 (C.D.Cal. 2015).

development and acceptance criteria-setting exercises." *See* Ex. A at 1. Likewise, the Waiver of Studies guidance indicates that it: "provides recommendations for sponsors of investigational new drug applications (INDs), and applicants who submit new drug applications (NDAs), abbreviated new drug applications (ANDAs), and supplements to these applications for immediate-release (IR) solid oral dosage forms, and who wish to request a waiver of an in vivo bioavailability (BA) and/or bioequivalence (BE) study requirement." *See* Ex. B at 1. Neither of the documents refer to acetaminophen at all.

Furthermore the Dissolution Testing guidance was finalized in 2018, and its stated purpose is to "provide manufacturers with recommendations for submission of new drug applications . . . ." Ex. A at 1. Given that the products at issue were allegedly purchased by Plaintiffs beginning two years ago, this guidance was not even applicable at the time the Defendant applied for approval of its generic medication. Moreover, its purpose is not guidance regarding ongoing regulation of drug labels. *Id.* Rather it is clearly intended as guidance for companies in the proper methods for completing applications for approval by the FDA. *Id.* As such, the Court would find that it is not applicable to the current action.

Finally, it is strange that Defendant attempts to present a preemption argument seeking to dismiss Plaintiffs' branding/labeling state causes of action by citing to documents which do not specifically (or really even remotely) govern the issue; and yet it fails to reference the controlling regulation which actually does delineate certain requirements as to labeling in regards to OTC drug products which contain acetaminophen (the active ingredient involved herein) – that is 21 C.F.R. § 201.326(a)(1).[5]

Federal preemption is an affirmative defense, so "it is [defendant's] burden to establish that it applies." *Perez v. Kroger Co.*, 2017 WL 3601998, Case No. 2:17-cv-02448-ODW-(AGR) (C.D.Cal. 2017). Given that Defendant has not thus far provided any binding regulation (or other applicable federal law) that would preempt Plaintiffs' state law claims, the Court would deny Defendant's motion to dismiss insofar as it is premised on federal preemption.

**B. Primary Jurisdiction Doctrine**

Defendant also argues that the Court should dismiss Plaintiffs' claims based on the doctrine of primary jurisdiction. MTD at 15-16. "The primary jurisdiction doctrine allows courts to stay proceedings or to dismiss a complaint without prejudice pending the resolution of an issue within

---

[5] It is also noted that Plaintiffs likewise did not cite to that relevant regulation.

the special competence of an administrative agency." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008). It "is a prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decision-making responsibility should be performed by the relevant agency rather than the courts." *GCB Commc'ns, Inc. v. U.S. S. Commc'ns, Inc.*, 650 F.3d 1257, 1263–64 (9th Cir. 2011) (internal quotation marks omitted). "It is useful ... in instances where the federal courts do have jurisdiction over an issue, but decide that a claim requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency." *Id*. at 1264 (internal quotation marks omitted). It applies in "limited circumstances" and is "not designed to secure expert advice from agencies every time a court is presented with an issue conceivably within the agency's ambit." *Clark*, 523 F.3d at 1114 (internal quotation marks omitted). The "deciding factor" in determining whether the primary jurisdiction doctrine should apply is "efficiency." *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1165 (9th Cir. 2007).

Here, the Court fails to see how the primary jurisdiction doctrine even comes into serious play. Defendant has failed to reference any pending or upcoming proceeding or other situation wherein the FDA intends to or will be specifically addressing an issue raised within the present litigation.[6] Additionally, the controversies raised in this action do not appear to be matters of first impression, nor particularly complicated. There is no reason to believe there would be any efficiency interest that would warrant dismissing Plaintiffs' claims under the primary jurisdiction doctrine. Therefore, the Court would decline Defendant's MTD on primary jurisdiction grounds.

### C. Failure to State a Claim Under California Consumer Protection Statutes

Defendant argues that Plaintiffs' UCL, FAL, and CLRA claims (Claims 1,2, and 3), "which are all premised on the allegation that Walmart falsely and misleadingly labeled the Equate Gelcap Products as 'Rapid Release,' should be dismissed for failure to state a claim" because Plaintiffs have not "plausibly alleged" that the labeling of the Equate Gelcap Products, using the words "rapid release" are false, deceptive, or misleading. *Id*. at 16. Defendant cites to the FDA regulations which it claims "*conclusively* prove that the Equate Gelcaps *are* 'Rapid Release.' " *Id*. For the same reasons set forth in the Court's analysis of preemption, the Court would disagree.

---

[6] Defendant's references to the two guidance documents cited above are insufficient. The FDA has declined to promulgate a single final regulation related to the dissolution standards for OTC analgesic medications, despite considering the issue as far back as 1988. *See* 1988 TFM. Defendant does not raise any indication that the FDA is intending to revisit that matter in the near future.

Case: 24-2568, 01/08/2025, DktEntry: 14.1, Page 48 of 51

**Add.10**

Case 2:18-cv-09655-GW-PSM Document 41-1 Filed 01/12/24 Page 31 of 14
Case 2:18-cv-09655-GW-PSM Document 30 Filed 07/23/19 Page 10 of 13 Page ID #:399

Although the FDA has released guidance indicating what constitutes "rapidly dissolving" and "very rapidly dissolving" OTC medications, that does not end the Court's inquiry into whether Plaintiffs have sufficiently alleged that the Equate gelcap labels are false, deceptive, or misleading.

As alleged by Plaintiffs, the advertising and labeling at issue indicates that the "rapid release" product would give the consumer "rapid relief." *See* FAC ¶¶ 82, 89. Whether that statement was false, deceptive, or misleading cannot be determined by reference to non-binding FDA guidance defining "rapidly dissolving" medication. Additionally, Plaintiffs have alleged that a study has demonstrated that Defendant's higher priced Equate rapid release acetaminophen gelcaps actually dissolve slower than its lower priced Equate non-rapid release tablets and that the Defendant knew (or should have known) that the former is not any faster or more effective than the latter. Under California's Consumer Protection Laws, a statement need not even necessarily be untrue, if for a reasonable consumer the statement would be "either actually misleading" or have the "capacity, likelihood, or tendency to deceive or confuse the public." *Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008). Taken in the light most favorable to Plaintiffs, they have certainly alleged that the labeling of the Equate gelcaps could have the capacity to confuse/mislead the public. The Equate gelcaps are sold as an alternative to traditional acetaminophen tablets, which are sold at a lower price and do not contain the statement "rapid release" language on the label. *See generally* FAC. It is certainly plausible that a reasonable consumer, under the circumstances, could be convinced by the Equate label, that it would provide more rapid relief than traditional acetaminophen tablets.

The Court is not convinced by any of the alternative contentions asserted by Defendant in support of its argument that Plaintiffs have failed to state a claim under the California Consumer Protection Statutes. Plaintiffs reliance on *In re iPhone 4s Consumer Litig.*, 637 F. App'x 414, 415 (9th Cir. 2016) is misplaced. In that case, the Circuit found that plaintiffs failed to allege with certainty what their expectations of the product were. *Id.* at 415-416. Here, Plaintiffs allege that they expected the rapid release gelcaps to work more quickly than traditional acetaminophen tablets. *See generally* FAC. Furthermore, Plaintiffs are not relying on lack of substantiation to make their claims. *See* MTD at 20. They are merely utilizing a scientific study as evidence that the labeling of the Equate gelcaps was misleading. The study also does nothing to disprove Plaintiffs' claim. As explained above, Plaintiffs need not show that Defendant's claims were necessarily untrue if they can prove that the claims would mislead a reasonable consumer. Finally,

9

the Court will not dismiss, at this time, Plaintiffs' claims on the assertion that the Equate gelcaps labeling and advertisements were "mere puffery." MTD at 19. As stated previously, unlike in *Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Service Inc.*, 911 F.2d 242, 245-46 (9th Cir. 1990), Plaintiffs here have asserted facts which would plausibly lead to the conclusion that a reasonable consumer could interpret the Equate labels to contain factual statements upon which he or she could rely.

The Court would also find that Plaintiffs have plausibly stated a claim that Defendant violated its duty to disclose. Under *Warner Constr. Corp. v. City of Los Angeles*, 2 Cal.3d 285, 294 (1990), a cause of action for duty to disclose may arise if "the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosures likely to mislead." *Id.* Here, Plaintiffs allege that Defendant stated that the gelcaps would provide "rapid relief" but did not qualify that statement with the fact that the relief would be no more "rapid" than that provided with its alternative traditional tablets. *See generally* FAC. This omission, as alleged in the FAC, had a likelihood of misleading consumers, and did mislead Named Plaintiffs. *See generally* FAC. Therefore, the Court is not convinced by this argument by Defendant.

Finally, Plaintiff Edwards has standing to pursue her California consumer protection claims. Under the UCL, FAL, and CLRA a plaintiff must show that a misrepresentation was an immediate cause of the alleged injury, but it is not "necessary that [plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor influencing his conduct." *In re Tobacco II Cases*, 46 Cal.4th 298, 326 (Cal. 2009). Here, although Edward's doctor suggested she purchase Equate gelcaps, she also clearly asserts that she relied upon the labeling of the product in deciding to make her purchase. FAC ¶ 82-84. Therefore, Defendant's argument that Edwards lacks standing fails.

Thus the Court would decline to dismiss any of Plaintiffs' consumer protection claims on the basis of failure to state a claim.

**D. California's Safe Harbor Doctrine**

Defendant claims that Plaintiffs' FAL (Claim 1), UCL (Claim 2), and CLRA (Claim 3) claims should be dismissed under California's "safe harbor" doctrine because it has complied with the FDA regulatory scheme for using the words "rapid release." MTD at 21. This argument fails for the same reasons Defendant's argument related to preemption fails. *See Von Koenig v. Snapple*

# Add.12

*Beverage Corp.*, 713 F.Supp.2d 1066, 1076 (E.D.Cal. 2010) ("[T]he determination of whether federal policy is to be accorded the weight of federal law for purposes of the application of the safe harbor rule is analogous to that same determination for the purposes of preemption."). Defendant has not established any binding federal law or regulation that governs the use of the words "rapid release" or exactly how the Defendant maneuvered itself into that position. Therefore, the Court would decline to dismiss Plaintiffs' claims based on California's safe harbor doctrine.

### E. Failure to State a Claim for Breach of Implied and Express Warranty

Defendant asserts that Plaintiffs' warranty causes of action under the Song-Berverly Act (Claim 4), the UCC (Claims 5 and 6) and the Magnuson-Moss Warranty Act (Claim 7) must be dismissed because the FAC does not plausibly allege that Walmart failed to fulfill any of the "promises or affirmations of fact on the label." MTD at 22-23. The Court would agree. The only language which Plaintiffs appear to reference are the words "rapid release" and, thereafter, they make the generalized contention that the rapid release gelcaps do not conform to the promises or affirmations of fact made on the label or in the advertising and marketing of the product because they do not provide "rapid release or provide rapid release faster than cheaper, non-rapid release acetaminophen Walmart Equate products." *See* FAC at ¶¶ 141-42, 152-53, 163-64, 177. However, Plaintiffs fail to reference or allege that there is actual language on the Defendant's rapid release gelcap packaging (or anywhere else in the product) which actually promises faster or cheaper relief. Nor have the Plaintiffs cited to any actual wording which incorporates comparative representations (*e.g.* "faster" as opposed to "fast"). To say that a product provides "rapid relief" is like saying it provides "fast relief." It is unclear what the warranty breach would be in that context. Likewise, Plaintiffs have not alleged that Defendant's challenged products do not in fact provide pain relief.

In sum, the Court would grant Defendant's motion to dismiss Plaintiffs' warranty causes of action but with leave to amend.

### F. Plaintiffs' Remaining Claims

Defendant asserts that Plaintiffs' claims for unjust enrichment (Claim 8) and declaratory relief (Claim 9) fail because they cannot serve as a stand alone claim for relief. This Court would agree. As stated in *Sacramento E.D.M., Inc. v. Hynes Aviation Indus.*, No. 2:13–cv–0288–KJN, 2017 WL 1383289 *20 (E.D. Ca. Apr. 18, 2017), "Declaratory relief and unjust enrichment are

# Add.13

not independent causes of action under California law; instead, they are forms of relief that may be requested in conjunction with a cognizable cause of action that permits a court to grant such relief." *See also Hill v. Roll Int'l Corp.*, 195 Cal. App. 4th 1295, 1307 (2011) ("Unjust enrichment is not a cause of action," therefore providing no basis for relief in the absence of an actionable wrong). Thus, claims 8 and 9 must be dismissed as they cannot constitute independent causes of action, although they may serve as a request for a form of relief that can be granted pursuant to some other claim.

## IV. Conclusion

In sum, the Court would **DENY** Defendant's MTD as to Plaintiffs' causes of action 1 through 3; **GRANT** it with leave to amend as to claims 4 through 7; and **Grant** it without leave to amend as to claims 8 and 9.